IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| WILLIAM C. PEAKE, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 12-1761 |
| PENNSYLVANIA STATE POLICE, | ) | Judge Cathy Bissoon |
| Defendant, | ) | |

# MEMORANDUM ORDER

## I. MEMORANDUM

For the reasons that follow, Defendant's Motion for Summary Judgment (Doc. 26) will be granted.

## BACKGROUND[1]

William C. Peake ("Plaintiff") initiated this lawsuit on December 4, 2012, alleging racial discrimination under Title VII of the Civil Rights Act of 1964, ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq*. Compl. (Doc. 1). Specifically, Plaintiff claims that the Pennsylvania State Police ("Defendant," or "PSP"), terminated his employment as a probationary state trooper because he is African-American, and otherwise treated non-members of his protected class more favorably. See generally id.

---

[1] The factual background is derived from the undisputed evidence of record and the disputed evidence viewed in the light most favorable to the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

As the parties are well acquainted with the facts, the Court will provide only a brief summary for context. Plaintiff enlisted in the PSP on May 4, 2009. See Def.'s Exhibit M (Doc. 29-2) at p. 120. Prospective PSP troopers must successfully complete an 18-month probationary period, which is comprised of six months of study at PSP training academy followed by a 12-month field training program. Def.'s Stmt. of Facts (Doc. 28) at ¶¶ 1-3. Plaintiff was one of four African-American graduates from his 88-member training academy class in late November 2009. Pl.'s Stmt. of Facts (Doc. 41) at ¶¶ 64, 66. For his field training, Plaintiff was assigned to the Uniontown barracks, which is part of PSP Troop B. Id. at ¶ 68. Seven other probationary troopers were assigned to Troop B, all of whom were white. Id. at ¶ 123.

On November 3, 2010, the scheduled end of Plaintiff's probationary period, Plaintiff was terminated. See Def.'s Exhibit M at p. 120; Def.'s Stmt. of Facts at ¶ 18. On that same date, Plaintiff was presented with a letter explaining that "as a result of [his] lack of solid job knowledge and basic police skills, along with officer/public safety concerns, [he] do[es] not meet the standards set forth of a [PSP] trooper." Def.'s Exhibit H (Doc. 29-1) at p. 145. In making the decision to dismiss Plaintiff, the Commissioner of the PSP relied on the recommendation of a Review Panel, id., which provided several factors in support of its recommendation, Def.'s Exhibit F (Doc. 29-1) at pp. 90-91. These factors included: mishandled accident investigations; reports with incorrect information and numerous other errors; written and verbal communication problems; and competency concerns voiced by Plaintiff's "CO, supervisors, peer troopers and outside agency personnel." Id.

The Review Panel's recommendations were based on a General Investigation Report (the "GIR"), which was the product of an investigation into Plaintiff's performance conducted during the 13th or 14th month of his probation. Def.'s Stmt. of Facts at ¶¶ 7, 8. Of the 19 district

justices, assistant district attorneys, and PSP supervisors who were interviewed on Plaintiff's behalf, 13 recommended that the PSP not retain Plaintiff following his probation. Def.'s Exhibit B (Doc. 29-1) at pp. 33-40. None recommended that he be retained. Id.

The GIR reflected a number of Plaintiff's perceived shortcomings as a probationary trooper. First, Plaintiff was found to have treated two "reportable" vehicle accidents as "non-reportable." Id. at p. 32. Second, most of Plaintiff's supervisors who were surveyed noted pervasive and persistent issues with his report writing, including grammatical and spelling errors, inaccurate event narratives, and incorrect representations of fact. Id. at pp. 34-40. Sixteen "Report Correction Notices" were attached to the GIR, documenting occasions when such mistakes were brought to Plaintiff's attention. Id. at pp. 43-59. Problems with untimely reports were also noted, which, along with a couple missed magistrate hearings, were attributed to "his planning and time management." Id. at p. 36. Third, aside from Plaintiff's perceived written communication deficiencies, several individuals noted his difficulties in making himself understood verbally, both over the radio and in person. Id. at pp. 33, 35, 37, 38. One specific incident was recounted in which Plaintiff allegedly was unable to effectively convey the field sobriety test procedure to a suspected DUI offender. Id. at pp 38-39. Fourth and finally, multiple individuals described incidents supposedly handled improperly by Plaintiff. These included his failure to submit drug paraphernalia for testing, which resulted in dismissed charges in one instance, id. at p. 35, and a domestic assault investigation during which Plaintiff had to be instructed on the proper course of action, id. at pp. 36-37.

Plaintiff was the only one of Troop B's eight probationary troopers to be dismissed at the end of the probationary period. Pl.'s Stmt. of Facts at ¶ 120. The only other individual from Plaintiff's training academy class of 88 cadets to be terminated at the end of the training period

was a white male assigned to PSP Troop M ("Trooper #9"). Id. at ¶ 124. However, prior to being terminated, Trooper #9 first was given multiple extensions of his probationary period, totaling in excess of seven months, so that he could attempt to address his performance deficiencies. Id. at ¶¶ 124-25, 132. Plaintiff argues that he "was judged by different and more harsh standards than [these] other probationary troopers, because of his race." Compl. at ¶ 31.

## ANALYSIS

In the United States Court of Appeals for the Third Circuit:

> [c]laims of discrimination under Title VII are analyzed under the burden-shifting framework announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973). In order to show a *prima facie* case of racial discrimination, a plaintiff must illustrate that: (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the circumstances of the adverse employment action give rise to an inference of discrimination. If a plaintiff establishes a *prima facie* case, the employer must come forward with a legitimate, non-discriminatory reason for the adverse employment decision. If the defendant meets this burden, the plaintiff must then prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are merely a pretext for discrimination.

Johnson v. Keebler-Sunshine Biscuits, Inc., 214 F. App'x 239, 241-42 (3d Cir. 2007) (internal citations omitted).

In favor of summary judgment, Defendant first argues that Plaintiff cannot satisfy elements two or four of his *prima facie* case. Def.'s Brief (Doc. 27) at pp. 5-14. Defendant alternatively argues that, even if a *prima facie* case is established, Plaintiff cannot show that the legitimate reasons for Plaintiff's dismissal offered by Defendant are pretextual. Id. at p. 14. Defendant does not challenge that Plaintiff is a member of a protected class or that he suffered an adverse employment action. Each of Plaintiff's arguments will be addressed in turn.

Defendant's argument that Plaintiff is not qualified to be a PSP trooper misses the mark. Defendant attempts to substantiate this claim by extensively detailing each of Plaintiff's alleged

4

failings during his time as a probationary trooper. Id. at pp. 5-14. However, Plaintiff's subjective performance of the job has no bearing on the determination of whether he was qualified for said job. It has long been established that a plaintiff's qualifications for purposes of proving a *prima facie* case are evaluated under an "objective standard." Sempier v. Johnson & Higgins, 45 F.3d 724, 729 (3d Cir. 1995) (citing Weldon v. Kraft, Inc., 896 F.2d 793, 798 (3d Cir. 1990)). "[W]hile objective job qualifications should be considered in evaluating the plaintiff's *prima facie* case, the question of whether an employee possesses a subjective quality . . . is better left to the later stage of the McDonnell Douglas analysis." Weldon, 896 at 798. Here, there has been no assertion that Plaintiff lacked any of the objective job qualifications an individual must possess to be hired as a PSP trooper. As such, the facts that he was hired and successfully completed the training academy portion of the probationary period are sufficient to establish that he was qualified to be a trooper for the purposes of proving his *prima facie* case.

As to whether the circumstances under which Plaintiff was dismissed give rise to an inference of discrimination, to establish this element of the *prima facie* case:

> a plaintiff may either: (1) introduce evidence of comparators (i.e., similarly situated employees who (a) were not members of the same protected class and (b) were treated more favorably under similar circumstances); or (2) rely on circumstantial evidence that otherwise shows a causal nexus between his membership in a protected class and the adverse employment action.

Greene v. Virgin Islands Water & Power Auth., 557 F. App'x 189, 195 (3d Cir. 2014) (citing Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 n.7 (3d Cir. 2003)). While Plaintiff attempts to meet his burden of production by offering both types of evidence, his efforts ultimately are unsuccessful.

Plaintiff points to multiple supposed comparators who were treated more favorably than himself. Pl.'s Brief (Doc. 31) at pp. 9-17. These include the seven white probationary troopers

5

assigned to Troop B, as well as Trooper #9, a white male probationary trooper in Plaintiff's cadet class who was assigned to Troop M. Each of these individuals was outside of Plaintiff's protected class, African-American, and each was treated more favorably than Plaintiff; the seven Troop B probationary troopers were retained, and Trooper #9 was provided with a written action plan and an extended training period before ultimately being terminated. However, for the reasons that follow, none of these individuals is similarly situated to Plaintiff for the purpose of supporting an inference of discrimination.

"While 'similarly situated' does not mean identically situated, the plaintiff must nevertheless be similar in 'all relevant respects.'" Opsatnik v. Norfolk S. Corp., 335 F. App'x 220, 222-23 (3d Cir. 2009) (quoting Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997)). "A determination of whether employees are similarly situated takes into account factors such as the employees' job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in." Wilcher v. Postmaster Gen., 441 F. App'x 879, 882 (3d Cir. 2011) (citing Lee v. Kansas City S. Ry. Co., 574 F.3d 253, 259–61 (5th Cir. 2009)).

With respect to the similarity of the misconduct, "the focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action." Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 647 (3d Cir. 1998) (citing Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 528 (3d Cir. 1992)). "The employee's positive performance in another category is not relevant," id., "and neither is the employee's judgment as to the importance of the stated criterion," id. (citing Healy v. New York Life Ins. Co., 860 F.2d 1209, 1216 (3d Cir. 1988)." Further, "purported comparators must have committed offenses of 'comparable seriousness.'" Opsatnik, 335 F. App'x at 223 (quoting Wright v. Murray Guard, Inc., 455 F.3d 702, 710 (6th Cir. 2006)).

6

Plaintiff relies primarily on Trooper #9 as a comparator. This reliance is misplaced. Although there is unquestionably a great deal of overlap among Plaintiff's and Trooper #9's noted areas of deficiencies, there are clear distinctions in the measure of some of those shortcomings. In particular, Trooper #9 never received less than a rating of "Borderline-Needs Improvement" for any category in each of his three Probationary Trooper Evaluations. See Pl.'s Exhibits PX21-PX23 (Docs. 41-2 – 41-4). In contrast, Plaintiff received three ratings of "Unsatisfactory" between his second and third evaluations. See Def.'s Exhibit M. Plaintiff also received a total of three fewer "Satisfactory" ratings over the three evaluations as compared to Trooper #9. Compare Pl.'s Exhibits PX21-PX23, with Def.'s Exhibit M.

Perhaps even more telling were the investigations conducted on Plaintiff and Trooper #9 in early September of 2010 in order to determine whether each should be retained by the PSP. As part of these investigations, "interviews with supervisors, coaches, district justices, and individuals with whom the probationary trooper came into contact with" are conducted to aid in this determination. Def.'s Exhibit A (Doc. 29-1) at p. 26. Of the 16 individuals interviewed on Trooper #9's behalf, only one recommended that he not be retained by the PSP, where five recommended an extension of the probation period, and six offered no opinion. Pl.'s Exhibit PX25 at pp. 3-6. In Plaintiff's case, 13 of the 19 individuals interviewed recommended that the PSP not retain him, with all others offering no opinion. Def.'s Exhibit B at pp. 33-40. This was despite the fact that "[e]very person interviewed regarding this investigation mentioned that [Plaintiff] is polite and treats them with respect," and that Plaintiff's "positive attitude,"

7

professionalism, and "sociable" nature were noted. Id. at p. 40. Given these distinctions, Trooper #9 is not sufficiently similarly situated to Plaintiff to serve as a valid comparator.[2]

Plaintiff's reliance on the other probationary troopers assigned with him to Troop B as comparators equally is unavailing. In this regard, Plaintiff points to several of these individuals who had some combination of: 1) productivity inferior to his own; 2) at-fault automobile accidents; and 3) incidents involving bodily harm to members of the public. Pl.'s Brief at pp. 5-7. Plaintiff argues that, although he performed better than certain other Troop B probationary troopers in one or more of these important areas, they were treated more favorably by being retained. Id. This argument fails to recognize that Plaintiff's dismissal was in no way attributed to failings in *any* of these areas. See Exhibit F at pp. 90-91; Exhibit H at p. 145. Instead, the "key points" supporting Plaintiff's dismissal were: (1) mishandled accident investigations; (2) deficiencies in report writing; (3) difficulty with written and verbal communications; and (4) competency concerns voiced by those who observed Plaintiff. See Exhibit F at pp. 90-91. Because the focus of the inquiry must be on "the particular criteria or qualifications identified by the employer as the reason for the adverse action," any Troop B probationary trooper misconduct with respect to other criteria is irrelevant to the determination of whether any of these individuals is similarly situated to Plaintiff. See Simpson, 142 F.3d at 647. As Plaintiff can point to no other probationary trooper at Troop B who was similarly situated to himself, none can serve as a comparator to support an inference of discriminatory circumstances.

With no similarly situated employee to compare his own treatment with, Plaintiff must satisfy his burden of production with respect to the fourth element of his *prima facie* case with other circumstantial evidence. To this end, Plaintiff alleges that African-Americans "were

---

[2] It also should be noted that Plaintiff and Trooper #9 were evaluated and supervised by entirely different people, further distinguishing them from each other.

8

grossly underrepresented within the ranks of full-time non-probationary troopers." Pl.'s Brief at p. 2. Additionally, Plaintiff notes that the seven remaining white probationary troopers assigned to Troop B with him were retained, and that only four of the 88 cadets in his training class were African-American. Pl.'s Stmt. of Facts at ¶ 123. Standing alone, these facts are insufficient to illustrate that Plaintiff was dismissed under circumstances giving rise to an inference of discrimination. "[I]n individual disparate treatment cases such as this, statistical evidence, which "may be helpful, . . . [is] ordinarily not dispositive.'" Bruno v. W.B. Saunders Co., 882 F.2d 760, 767 (3d Cir. 1989) (quoting Krodel v. Young, 748 F.2d 701, 710 (D.C. Cir. 1984)). In any case, "the usefulness of statistics will depend primarily upon their relevance to the specific decision affecting the individual plaintiff," id., and more broadly "on all of the surrounding facts and circumstances," Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 340 (1977). "In order to be useful in establishing a *prima facie* case, statistics must assist the plaintiff in proving discrimination in h[is] particular case." Blue v. Def. Logistics Agency, 181 F. App'x 272, 274 (3d Cir. 2006) (citing Krodel, 748 F.2d at 710)).

The "statistics" provided by Plaintiff here do not meet these requirements. First, Plaintiff's assertion that African-Americans are underrepresented in the PSP, aside from being vague, conclusory and unsupported by actual numbers, is far "too general to be relevant or useful in establishing a *prima facie* case of discrimination." Blue, 181 F. App'x at 274 (citing Ezold, 983 F.2d at 542–43). Next, the fact that there were only four African-Americans in his cadet class has no relevance whatsoever to the specific decision to dismiss Plaintiff; one of the individuals who actually was admitted to the program. Finally, any inference of discrimination supported by the dismissal of the only African-American probationary trooper assigned to Troop B is lost when it is noted that the three other African-American members of Plaintiff's cadet

9

class were all retained. Pl.'s Stmt. of Facts at ¶ 124. In short, Plaintiff's circumstantial evidence in no way "shows a causal nexus between his membership in a protected class and the adverse employment action." Greene, 557 F. App'x at 195.

Having failed to illustrate that the circumstances of his dismissal give rise to an inference of discrimination, Plaintiff cannot prove his *prima facie* case. See Johnson, 214 F. App'x at 241-42. However, even if Plaintiff had met his burden of production here, his claim could not survive summary judgment. As prescribed by McDonnell Douglas, Defendant has met its subsequent burden of offering legitimate, nondiscriminatory reasons for dismissing Plaintiff. Id. Specifically, Defendant notes Plaintiff's mishandling of accident investigations, his struggles with report writing, his problems with communication, and the concerns that others have voiced about his competency. Def.'s Brief at pp. 8-15. Thus, the burden of production switches back to Plaintiff. Id.

> To survive summary judgment when the employer has articulated a legitimate nondiscriminatory reason for its action, the plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."

Simpson, 142 F.3d at 644 (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)). Plaintiff has satisfied neither of the prongs of the Fuentes pretext analysis.

With respect to the first prong of the analysis, a plaintiff need not "produce additional evidence beyond h[is] *prima facie* case." Id. He "must, however, point to 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons such that a reasonable factfinder could rationally find them unworthy of credence' and hence infer that the proffered nondiscriminatory reason 'did not actually motivate' the employer's action." Id. (quoting Fuentes, 32 F.3d at 764-65).

Plaintiff offers very little in an attempt to undermine Defendant's legitimate, nondiscriminatory reasons for dismissing him. While Plaintiff does offer explanations, or even outright denials, for the numerous circumstances which provide the foundation for Defendant's negative evaluations of him, see Peake Affidavit (Doc. 33-8) at pp. 2-5, such assertions alone "do[] not create a material issue of fact," Fuentes, 32 F.3d at 766. A "plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Id. at 765. Thus, Plaintiff's assertions that Defendant's evaluations of him were based on wrong or mistaken perceptions of his performance cannot, without more, support the reasonable conclusion that such misapprehensions were actually the product of discriminatory animus.

In his only other argument with respect to prong one of the Fuentes pretext analysis, Plaintiff points to a "contradiction" between the reference in his termination letter to "basic police skills" as one of the reasons for his dismissal and his rating of "Satisfactory" in a category with the same name on his final probationary trooper evaluation completed less than three months prior. Pl.'s Brief at pp. 17-18 (citing Def.'s Exhibit H at p. 145; Def.'s Exhibit M at p. 156). This argument is a red herring. To begin with, it seems clear that the Termination Letter's use of the phrase "basic police skills" was in reference to the factors listed by the Review Panel in recommending Plaintiff's dismissal, not to a category on earlier probationary trooper evaluation forms. See Def.'s Exhibit F at 90-91; Def.'s Exhibit H at p. 145. Moreover, Defendant has offered multiple legitimate reasons for terminating Plaintiff, consistent with the evaluations of Plaintiff's performance. See generally Def.'s Brief. Plaintiff offers no evidence to suggest that any of these reasons are "unworthy of credence," Simpson, 142 F.3d at 644, but

11

instead attacks only a semantical straw man of "basic police skills." This cannot satisfy the first prong.

Plaintiff fares no better against prong two of the pretext analysis. Evidence relevant to this prong includes any that could "show that the employer has previously discriminated against h[im], that the employer has discriminated against other persons within the plaintiff's protected class or within another protected class, or that the employer has treated more favorably similarly situated persons not within the protected class." Id. at 645 (citing Fuentes, 32 F.3d at 765). Together, the evidence presented must have sufficient probative force to permit a factfinder to conclude by a preponderance of the evidence that the protected characteristic was a motivating or determinative factor in the employment decision. Simpson, 142 F.3d at 644-45. Plaintiff has offered no such evidence here.

Plaintiff points to no evidence for the purpose of proving pretext beyond that offered to support his *prima facie* case. As discussed in that context above, Plaintiff has identified no similarly situated non-African-American individual who was treated more favorably by the PSP. There is also nothing to suggest that Plaintiff was ever previously discriminated against by the PSP. And, although "[s]tatistical evidence of an employer's pattern and practice with respect to minority employment may be relevant to a showing of pretext, Ezold, 983 F.2d at 542 (citing McDonnell Douglas, 411 U.S. at 805), such evidence must be accompanied by some "analysis of either the qualified applicant pool or the flow of qualified candidates over a relevant time period" to have probative value, id. at 543. Plaintiff's assertions of underrepresentation of African-Americans in his cadet class and in the PSP in general, without the benefit of any such analysis, are not probative. See id. at 542-43. As Plaintiff has failed to satisfy either prong of the Fuentes

pretext analysis, summary judgment in Defendant's favor would be appropriate, even if Plaintiff had proved his *prima facie* case.

For these reasons, Defendant's Motion for Summary Judgment (Doc. 26) will be granted.

## **CONCLUSION**

Consistent with the analyses above, the Court hereby enters the following:

## **II. ORDER**

Defendant's Motion for Summary Judgment (**Doc. 26**) is **GRANTED**.

IT IS SO ORDERED.

June 10, 2015                                               s\Cathy Bissoon
                                                           Cathy Bissoon
                                                           United States District Judge

cc (via ECF email notification):

All Counsel of Record